YOLANDRA BEST AND ROY HUDSON, PETITIONERS V. DEPARTMENT OF HEALTH AND HUMAN SERVICES, JOHN UMSTEAD HOSPITAL, RESPONDENT

No. COA01-118

(Filed 7 May 2002)

## 1. Administrative Law— scope of review—State personnel just cause dismissal case

The trial court exercised the appropriate scope of review in a State personnel just cause dismissal case and the State Personnel Commission properly required petitioner state employees to prove the absence of substantial evidence of reasonable cause for their termination.

───────────

BEST v. DEPARTMENT OF HEALTH & HUMAN SERVS.

[149 N.C. App. 882 (2002)]

2.  **Public Officers and Employees— judicial review of agency decision—state employees' failure to submit to drug testing—reasonable cause**

 The trial court did not err by reversing the State Personnel Commission's (SPC) decision to dismiss petitioner state employees from their jobs for alleged reasonable cause based on their refusal to submit to a blood test for drugs in violation of the Department of Health and Human Services Directive 47, because the employer hospital did not have reasonable cause to request a drug test of petitioners based on the facts that: (1) although a coworker suspected a straw containing white residue that she saw in the chart room was used by petitioners for drug use, the coworker observed no erratic behavior by petitioners and she did not believe that either petitioner appeared to be under the influence of any substances; (2) searches revealed no substances on either petitioner, but did reveal a straw on one of the petitioners, which the coworker indicated was not the straw she saw earlier in the chart room; (3) other information relied upon by SPC, such as the suggestion that one petitioner instigated a telephone call to draw the coworker out of the chart room, was not discovered until later; (4) the coworker could not identify the power residue on the straw that she saw and she was not able to articulate any other basis for her suspicion; and (5) no other coworker had similar suspicions, and the strip searches of petitioners revealed nothing improper or illegal.

3.  **Constitutional Law— Fourth Amendment—unreasonable searches—drug testing of state employees**

 The Department of Health and Human Services had no basis to terminate petitioner state employees from employment for refusing to comply with the Department's request for petitioners to submit to drug testing, because: (1)the Department had no reasonable cause to request drug tests of petitioners; and (2) a person may not be discharged for refusing to waive a right which the Constitution guarantees to him, including the Fourth Amendment Right to be free from unreasonable searches.

4.  **Administrative Law— whole record test-findings of fact—reasonable cause—drug testing of state employees**

 The whole record test reveals that the evidence did not support the State Personnel Commission's findings of fact that John Umstead Hospital had reasonable cause to request that petitioner

state employees submit to drug testing, because: (1) a coworker's testimony reveals the absence of any specific objective and articulable facts and reasonable inferences drawn to show reasonable cause under Department of Health and Human Services Directive 47 or the Fourth Amendment of the United States Constitution; and (2) petitioners carried their burden of proving that their employer did not have reasonable cause to request that petitioners should submit to drug testing.

Judge TYSON dissenting.

Appeal by respondent from an order entered 24 October 2000 by Judge Abraham Penn Jones in Wake County Superior Court. Heard in the Court of Appeals 28 November 2001.

*Attorney General Roy Cooper, by Special Deputy Attorney General Richard E. Slipsky, for respondent-appellant.*

*Grafstein & Walczyk, P.L.L.C., by Lisa Grafstein and Konrad Schoen, for petitioner-appellees.*

HUDSON, Judge.

Respondent, the Department of Health and Human Resources ("the Department"), appeals an Order entered 24 October 2000 by Judge Abraham Penn Jones in the superior court which reversed and remanded the decision of the State Personnel Commission ("SPC"). For the reasons discussed herein, we affirm the superior court's order.

We begin with a brief summary of the pertinent facts. Petitioners Yolandra Best ("Ms. Best") and Roy Hudson ("Mr. Hudson") were employed by respondent-appellant Department of Health and Human Services at John Umstead Hospital ("JUH") beginning 4 March 1987 and 15 October 1992, respectively. Both worked as Health Care Technicians at JUH until they were discharged from their jobs on 19 February 1997. On Saturday, 15 February 1997, petitioners were on the job at JUH.

Ms. Amanda Blanks, a Rehabilitation Therapy Coordinator at JUH, was also at work that day, even though it was her scheduled day off. She initiated the chain of events which has culminated in these proceedings.

According to Ms. Blanks, on 15 February 1997, at around 9:30 a.m., she went through the nurses' workstation to the "chart room."

As she entered the chart room, she "ran into or saw Mr. Hudson initially, and Mr. Coles, who was also the healthcare tech on the ward, sitting at the counter." Ms. Blanks testified that "a few minutes later I saw Yolandra Best come out [of the chart room]." In the chart room, Ms. Blanks noticed on the counter "a set of keys, pack of cigarettes, and a straw about three to four inches long," with a "white residue in one end of it." Shortly thereafter, Ms. Blanks left the chart room to take a telephone call at the nurses' station. While she was "in the process of getting off the phone," Mr. Hudson "walked back into the nurse's station," asked where his keys were, stepped in to the chart room, and immediately exited the chart room with "a set of keys and the pack of cigarettes that had been laying on the counter." When Ms. Blanks re-entered the chart room, she noticed "that the keys, the cigarettes, and the straw that [she] had seen earlier were all missing." She "look[ed] around" for these items, but could not find them. On direct-examination Ms. Blanks testified that she did not see anyone else enter the chart room during that time, however, on cross-examination she admitted that she was not facing the chart room during the entire telephone conversation and may not have seen everyone in the area. Based on these observations, Ms. Blanks reported to her supervisor, Ms. Jo Schuchardt, that she suspected Mr. Hudson and Ms. Best of using the straw with illegal drugs.

Later that morning, Ms. Schuchardt informed Ms. Blanks that Dr. Patricia Christian (director of JUH), Mr. Sandy Brock (director of human resources at JUH), and Officer Pendleton (Butner Public Safety) were on their way to JUH. Officer Pendleton arrived first; when he did, Ms. Blanks related to him what she had seen and what she suspected. She gave Mr. Brock the same report when he arrived. Officer Pendleton waited for Ms. Best and Mr. Hudson, who had gone to lunch. When they returned, Officer Pendleton identified himself to them and asked Mr. Hudson to empty his pockets and show him the contents. Mr. Hudson complied; upon seeing a yellow straw from Mr. Hudson's front right pocket, Officer Pendleton "seized [the straw]. I picked it up. I looked at it, observed a white powdery substance inside the straw, and I seized it." Officer Pendleton and Ms. Blanks both testified that the straw seized had a bend in it and was not the one Ms. Blanks saw in the chart room. Officer Pendleton submitted the straw from Mr. Hudson's pocket to the SBI lab for analysis, which later revealed no controlled substance on the straw.

Officer Pendleton testified that he "frisked [Mr. Hudson] around his waist band and pulled his pant legs up and looked around the cuff

of his shoes, and that was it . . . ." Mr. Hudson, however, testified that as part of the search Officer Pendleton's "hands were down right far into my underclothes. He was going into my genital area. . . . Then he checked my socks and my shoes. . . . Then he told me to stand at the front of the truck facing the building, and he was going to search my truck. He asked me to unlock my truck." Mr. Hudson complied with all of these requests. At the conclusion of the search, Officer Pendleton told Mr. Hudson, "[t]hey're going to ask you to take a drug screen."

While Officer Pendleton was searching Mr. Hudson and his truck, Ms. Blanks and Ms. Schuchardt conducted a strip search of Ms. Best in a ladies' restroom. Ms. Best removed all of her outer garments while standing in the open portion of the restroom in front of Ms. Blanks and Ms. Schuchardt. Ms. Best testified in response to direct examination:

Q. How did they search you?

A. She told me to take off my sweater. I did.

THE COURT: Who told you to take it off? Who told you to take off your sweater?

A. Jo asked me to take off my sweater, and I did. Then she asked me to undo my blouse; I did. She asked me to undo my bra; I did.

Q. As you undid each article of clothing what did you do with them?

A. I opened them up. My blouse was buttoned in the front, and I opened it up and picked up the back part of the blouse. I did the same thing with my bra and opened it up and took to the back.

Q. And then what?

A. I had to pull down my pants and my pantyhose.

Ms. Best was visibly upset and crying during and after the search, in which no drugs or paraphernalia were found. Neither Ms. Blanks, Ms. Schuchardt, Mr. Brock, nor Officer Pendleton saw any evidence of abnormal or erratic behavior, nor did any of them see any indication that either petitioner was impaired. Mr. Hudson also described what sort of activities usually took place in the chart room and how straws were normally found in the chart room:

BEST v. DEPARTMENT OF HEALTH & HUMAN SERVS.

[149 N.C. App. 882 (2002)]

Q: Tell us—we've heard a lot about the chart room. Can you describe, briefly, the dimensions of it and generally what it's used for?

A: Yes. It's a room that's probably about 5 by 9 or so. It has charts in there. It has equipment that's used for drawing blood. It has some manuals in there for that. I know that because they generally pertain to me because I (inaudible) that board. It has patients' charts, patient belongings, and food items and staff belongings. It's normally an all-purpose.

Q: People keep their stuff in there? Their food in there?

A: At times, yes.

Q: Did anybody ever mix medications in there?

A: Yes, it has been used for that.

Q: Okay. Did you all ever use straws to mix medications?

A: Yes. I did not, but I have others do so, yes.

After completing both searches, Mr. Brock, Ms. Blanks, and Ms. Schuchardt met with Ms. Best and Mr. Hudson in Ms. Schuchardt's office. During the meeting, Mr. Hudson asked Ms. Schuchardt for a copy of the Department of Human Resources workplace drug policy, Directive No. 47 ("Directive 47"). Ms. Schuchardt told Mr. Hudson that she did not know where a copy of the policy was located, and neither Mr. Hudson nor Ms. Best saw Directive 47 at any time on 15 February 1997.

Mr. Brock testified that he left the room to call Dr. Christian, that he told her about the straw Ms. Blanks saw, and that the one seized was not the same one as seen in the chart room, but they agreed they had "reasonable cause" to request a drug test of petitioners. Mr. Brock informed Ms. Best and Mr. Hudson that under the policy, they were expected to take a drug screening test and that "failure to comply with the requested drug screen could lead to a dismissal." The policy also required that petitioners be advised of "the basis for reasonable cause;" Mr. Brock testified that to comply, he told petitioners only about the straw that Ms. Blanks had seen.

Ms. Best and Mr. Hudson left the room after signing forms indicating that they did not consent to a drug test. Ms. Best explained: "I thought it (the drug test) couldn't have been [fair] because what they were doing to me wasn't fair." Mr. Hudson explained during his testi-

mony that he did not consent to the drug test because, "I did not understand what was going on. I did not know why this was happening to me, and I was actually—I was afraid of them at that time. . . .and I just said no." After petitioners refused to consent to the drug tests, "[t]hey told us (Mr. Hudson and Ms. Best) to go home."

Petitioners made appointments with Butner Creedmoor Family Medicine for drug screening tests on Tuesday morning, 18 February 1997, three days after the incident at JUH. Both tested negative and brought their test results with them to their pre-dismissal conferences on that same day. Mr. Hudson and Ms. Best were dismissed, effective 20 February 1997, for refusing to submit to a blood test for drugs in violation of DHR Directive 47.

The Department has established a multi-step appeal procedure for a terminated employee. "Step 1" requires the employee to file a grievance with his/her immediate supervisor. At "Step 2" and "Step 3," the employee files an "Employee Grievance Filing Form" with a specific authorized person in the Unit Personnel Office; at "Step 3," the Department provides a hearing. Petitioners Hudson and Best appealed their dismissal by following these procedures. Their "Step 3" hearing was held 14 May 1997 before Ann Stone, a Department hearing officer. Ms. Stone issued a recommended decision in favor of petitioners. By letters dated 17 June 1997, H. David Bruton, M.D., Secretary of the Department, informed petitioners that he did not adopt the recommended decision. Instead, he concluded there was "reasonable cause to test [petitioners] for drugs on the morning of February 15, 1997, and that Hospital management's instruction to [petitioners] to take a drug test was reasonable under the circumstances."

In July 1997, Ms. Best and Mr. Hudson filed "Petition[s] For A Contested Case Hearing" with the Office of Administrative Hearings, challenging their dismissals from JUH. Petitioners' cases were heard together on 19-20 March 1998 before Administrative Law Judge Sammie Chess, Jr. ("ALJ"), who issued a recommended decision on 13 August 1998. The ALJ proposed extensive findings of fact and concluded as law, *inter alia*, that "[t]he request that Petitioners immediately submit to drug screens was not reasonable under the circumstances;" that "Petitioners' refusals of the drug screens were reasonable refusals under the circumstances;" and that "Petitioners made reasonable efforts to comply with Respondent's request [for a drug screen]." He finally concluded that "Respondent had no just cause to discharge Petitioners for failing to submit to drug screens

that were ordered in violation of the Fourth Amendment prohibition against unreasonable searches," and recommended that "both Petitioners be reinstated with back pay and benefits from the date of termination, and attorneys fees."

The Department disagreed with the ALJ's recommended decision, and submitted a "Proposed Decision and Order" to the SPC. The SPC considered the case on 10 December 1998 and declined to adopt the ALJ's recommended decision, but instead adopted some of the recommended findings and conclusions, and changed many. In part, the SPC concluded that the Department did have reasonable cause to request a drug test and that, "Petitioners blatantly refused to comply with the reasonable request of the Respondent and therefore engaged in insubordination and personal misconduct. Petitioners were not entitled to unilaterally determine which of the Respondent's directives they would comply with, when, and on what terms." The SPC also concluded that "Respondent had just cause to discharge Petitioners for failing to submit to drug screens." The SPC finally ordered that "Respondent's disciplinary action with regard to the Petitioners' employment be affirmed and the Commission hereby finds that the Petitioners failed to meet their burden of proof showing that the Respondent lacked just cause for their dismissals for personal misconduct."

Petitioners filed a joint "Petition for Judicial Review" of the SPC's order in Superior Court alleging that a number of the SPC's findings of fact and the decision to reverse the recommendations of the ALJ were "not supported by the record, and [were] arbitrary and capricious." Petitioners also alleged that the SPC's conclusions of law and decision were "affected by errors of law." Both sides filed extensive briefs with the Superior Court, addressing the facts, the law, and the applicable standards of review.

On 9 December 1999, Superior Court Judge Abraham Penn Jones heard argument on the Petition for Judicial Review and, on 24 October 2000, issued an Order reversing the decision of the SPC. The court "reviewed the conclusions of law and statements of law contained in the Decision and Order *de novo*, and determined that the Commission's decision was affected by errors of law." The superior court also reviewed *de novo* the pertinent constitutional issues, specifically Fourth Amendment search and seizure implications, and concluded that the SPC's decision was affected by errors of law. Next, the superior court "employed the 'whole record' test in reviewing Petitioners' contention that the [SPC's] decision was not supported

by substantial evidence in the record, and determined that the [SPC's] decision was not supported by substantial evidence in the record." "The Court employed the 'whole record' test in reviewing the Petitioners' contention that the [SPC's] decision was arbitrary and capricious, and determined that the [SPC's] decision was arbitrary and capricious." The superior court ordered "that the Decision and Order of the [SPC] is reversed and this matter is remanded to the [SPC] for further proceedings consistent with this Order."

On 16 November 2000, the Department appealed to this Court, alleging that (1) the SPC's decision was not affected by errors of law, and (2) the SPC's decision and order was supported by substantial evidence in the record. We affirm the superior court.

Before reaching the Department's assignments of error, we address the standard of review this Court applies in cases governed by the Administrative Procedure Act ("APA"). *See* N.C. Gen. Stat. §§ 150B-1 to -52 (1999). On review, we are required to "examine[] the trial court's order for error[s] of law" by "(1) determining whether the trial court exercised the appropriate scope of review and, if appropriate, (2) deciding whether the court did so properly." *Amanini v. N.C. Dept. of Human Resources*, 114 N.C. App. 668, 675, 443 S.E.2d 114, 118-19 (1994); *see also Act-up Triangle v. Commission for Health Services*, 345 N.C. 699, 706, 483 S.E.2d 388, 392 (1997). "[T]he proper manner of review depends upon the particular issues presented on appeal." *Id.* at 674, 443 S.E.2d at 118 (citing *In re Appeal by McCrary*, 112 N.C. App. 161, 165, 435 S.E.2d 359, 363 (1993)). If the petitioner alleges that the agency's decision was based on an error of law, then the superior court applies *de novo* review. *See id. De novo* review requires the court "to consider a question anew, as if not considered or decided by the agency." *Id.* If the petitioner alleges either that the agency's decision was not supported by the evidence, or that the agency's decision was arbitrary and capricious, then the superior court applies the "whole record" test. *See id.; see also* N.C. Gen. Stat. § 150B-51(b) (1999). "The 'whole record' test requires the reviewing court to examine all competent evidence (the 'whole record') in order to determine whether the agency decision is supported by 'substantial evidence.'" *Amanini*, 114 N.C. App. at 674, 443 S.E.2d at 118 (quoting *Rector v. N.C. Sheriffs' Educ. and Training Standards Comm.*, 103 N.C. App. 527, 532, 406 S.E.2d 613, 616 (1991)).

[W]hile [t]he nature of the contended error dictates the applicable scope of review, this rule should not be interpreted to mean the manner of . . . review is governed merely by the label an

appellant places upon an assignment of error; rather, [the court] first determine[s] the actual nature of the contended error, then proceed[s] with an application of the proper scope of review.

*In re Appeal of Willis*, 129 N.C. App. 499, 501, 500 S.E.2d 723, 725-26 (1998) (citing *Utilities Comm. v. Oil Co.*, 302 N.C. 14, 21, 273 S.E.2d 232, 236 (1981); *Amanini*, 114 N.C. App. at 675, 443 S.E.2d at 118) (internal quotations omitted)).

[1] Accordingly, the first question we reach is "whether the trial court exercised the appropriate scope of review." *See Act-up*, 345 N.C. at 706, 483 S.E.2d at 392. We noted in *Willis*, 129 N.C. App. at 503, 500 S.E.2d at 726-27, and *Hedgepeth v. N. C. Div. of Servs. for the Blind*, 142 N.C. App. 338, 348, 543 S.E.2d 169, 175 (2001), that in reviewing a decision from an agency, a superior court's order must: (1) set out the appropriate standards of review, and (2) "delineate which standard the court utilized in resolving each separate issue raised by the parties." Without these two necessary steps, "this Court is unable to make the requisite threshold determination that the trial court 'exercised the appropriate scope of review.'" *See Hedgepeth*, 142 N.C. App. at 348, 543 S.E.2d at 175 (quoting *Willis*, 129 N.C. App. at 503, 500 S.E.2d at 726-27). Here, there are multiple issues on appeal, some requiring *de novo* review and others requiring the "whole record" test. *See McCrary*, 112 N.C. App. at 165, 435 S.E.2d at 363 ("A reviewing court may even utilize more than one standard of review if the nature of the issues raised so requires." (emphasis omitted)). The superior court properly set out the appropriate standards of review and delineated which standard of review it was applying to each error alleged. *See Gray v. North Carolina Dept. of Environment, Health, and Natural Services*, 149 N.C. App. ——, 560 S.E.2d 394 (2002); *Act-up*, 345 N.C. at 706, 483 S.E.2d at 392.

At the heart of the Department's arguments on appeal lies the issue of whether JUH had reasonable cause to request that petitioners submit to drug tests. In its Decision and Order, the SPC concluded that it did; the superior court concluded that it did not. If JUH did not have reasonable cause, the petitioners were entitled to refuse to submit to the drug tests. As a direct result of their refusal to submit to the drug test, the Department fired petitioners. The SPC determined that "Respondent had just cause to discharge Petitioners for failing to submit to drug screens." The superior court reversed the termination. Consequently, the ultimate determination of whether the Department was justified in dismissing petitioners from their jobs stems from the determination of reasonable cause. We review the burden of proof of

reasonable cause, and then address the law defining reasonable cause.

The SPC concluded that "[t]he burden of proof lies on the Petitioners to prove the Respondent lacked just cause for their dismissals. Petitioners did not meet their burden of proof." The Petitioners must prove that there was not "substantial evidence in the findings of fact which would support these conclusions." *Walker v. N.C. Dept. of Human Resources*, 100 N.C. App. 498, 503-04, 397 S.E.2d 350, 354 (1990), *disc. rev. denied*, 328 N.C. 98, 402 S.E.2d 430 (1991); *see also Employment Security Comm. v. Peace*, 128 N.C. App. 1, 12, 493 S.E.2d 466, 473 (1997) (noting that in "just cause" dismissal cases, an employee might have the burden of proving a negative), *aff'd in part*, 349 N.C. 315, 507 S.E.2d 272 (1998). While we recognize that proving a negative may be difficult, the Supreme Court has approved placing this burden of proof on the employee in State personnel "just cause" dismissal cases. *See, e.g., Soles v. City of Raleigh Civil Service Comm.*, 345 N.C. 443, 448-50, 480 S.E.2d 685, 688-89 (1997); *Peace v. Employment Sec. Comm'n*, 349 N.C. 315, 507 S.E.2d 272 (1998). In *Peace*, a divided Court stated that placing the burden of proof on the employee does not violate due process because, "[t]he statutory protections afford a terminated State employee a comprehensive and effective deterrent against erroneous decisions. A terminated employee may avail himself not only of administrative review incorporating full discovery of information and an evidentiary hearing, but may also obtain judicial review of the final agency decision." 349 N.C. at 327, 507 S.E.2d at 280. Here, the SPC properly required the petitioners to prove the absence of substantial evidence of just cause for their termination.

**[2]** The central issue in this case, therefore, is whether the Petitioners carried their burden of proving that there was not substantial evidence of reasonable cause to justify JUH's request that Petitioners submit to drug tests. The Department contends that the evidence established reasonable cause for it to request a drug test. The SPC agreed with the Department, but the superior court did not. The issue of "reasonable cause" is a legal issue and is subject to *de novo* review by this Court. For the reasons explained below, we conclude that JUH did not have reasonable cause to request a drug test of petitioners.

In 1989, the United State Supreme Court, in *Skinner v. Railway Labor Exec. Assn.*, declared that urine tests on employees, for the purpose of indicating the use of controlled substances, are searches

regulated by the Fourth Amendment of the United States Constitution. *See Skinner*, 489 U.S. 602, 617, 103 L. Ed. 2d 639, 660 (1989). The Court in *Skinner* noted that the "Fourth Amendment does not proscribe all searches and seizures, but only those that are unreasonable." *Id.* at 619, 103 L. Ed. 2d at 661. Further, "[t]he essential purpose of the Fourth Amendment is to 'impose a standard of reasonableness upon the exercise of discretion by government officials . . . in order to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials." *Boesche v. Raleigh-Durham Airport Authority*, 111 N.C. App. 149, 153, 432 S.E.2d 137, 140 (1993) (quoting *Delaware v. Prouse*, 440 U.S. 648, 653-54, 59 L. Ed. 2d 660, 667 (1979); *Camara v. Municipal Court*, 387 U.S. 523, 528, 18 L. Ed. 2d 930, 935 (1967)). What is "reasonable" depends on the privacy and governmental interests involved in the individual case. *See Treasury Employees v. Von Raab*, 489 U.S. 656, 671, 103 L. Ed. 2d 685, 706 (1989) (noting that certain types of public employees, like Customs agents, have "diminish[ed] privacy expectations even with respect to such personal searches.").

The petitioners here are subject to a "drug-free workplace" policy as state employees. To implement this policy, JUH must comply with the minimum protections against unreasonable search and seizure provided by the Fourth Amendment to the United States Constitution. "Within our federal system the substantive rights provided by the Federal Constitution define only a minimum. State law may recognize liberty interests more extensive than those independently protected by the Federal Constitution." *Mills v. Rogers*, 457 U.S. 291, 300, 73 L. Ed. 2d 16, 23 (1982) (citing *Greenholtz v. Nebraska Penal Inmates*, 442 U.S. 1, 7, 60 L. Ed. 2d 668, 675 (1979); *Oregon v. Hass*, 420 U.S. 714, 719, 43 L. Ed. 2d 570, 575 (1975)). "Moreover, a State may confer procedural protections of liberty interests that extend those minimally required by the Constitution of the United States." *Id.* at 300, 73 L. Ed. 2d at 24 (emphasis omitted).

The Department contends that JUH based its request that petitioners take a drug test on the "Alcohol and Drug Free Workplace Policy" (Directive 47) promulgated by the Department, which does comply with Fourth Amendment standards. Directive 47 states: "[w]hen management has *reasonable cause* to believe an employee is using or is under the influence of alcohol or a controlled substance in violation of this policy, the employee may be required to submit to a drug and/or alcohol test." (emphasis added). The policy further defines testing based on reasonable cause as follows:

BEST v. DEPARTMENT OF HEALTH & HUMAN SERVS.

[149 N.C. App. 882 (2002)]

testing based on a belief that an employee is using or has used alcohol or drugs in violation of the department's policy drawn from specific objective and articulable facts and reasonable inferences drawn from those facts in light of experience. Among other things, such facts and inferences may be based on, but not limited to, one of the following:

[A.] Direct observation of abnormal conduct or erratic behavior by the employee which may render the employee unable to perform his/her duties or which may pose a threat to safety or health.

[B.] A report of observed alcohol or drug use provided by a reliable and credible source.

[C.] An on-the-job accident or occurrence where there is evidence to indicate the accident or occurrence, in whole or in part, may have been the result of the employee's use of a controlled substance or alcohol.

[D.] Evidence that an employee is involved in the use, possession, sale, solicitation, or transfer of drugs or alcohol while working or while on the employer's premises or operating the employer's vehicle, machinery, or equipment.

Directive 47 requires "specific objective and articulable facts and reasonable inferences" before requesting a drug test of an employee. The Federal Courts have approved a requirement of "reasonable suspicion." *American Federation of Government Employees, AFL-CIO v. Roberts*, 9 F.3d 1464, 1468 (9th Cir. 1993). The Court in *Roberts* noted that " '[a]lthough reasonable suspicion does not require certainty, mere 'hunches' are not sufficient to meet this standard.' " *Roberts*, 9 F.3d at 1468 (quoting *American Fed. of Gov't Employees, Local 2391 v. Martin*, 969 F.2d 788, 790, n.1 (9th Cir. 1992)). While reasonable cause is a less demanding standard than probable cause, it does require articulable suspicion based on reliable information. *See Garrison v. Department of Justice*, 72 F.3d 1566, 1569 (Fed. Cir. 1996), *cert. denied*, 519 U.S. 948, 136 L. Ed. 2d 250 (1996). We conclude that JUH's application of "reasonable cause" here did not comply with even the minimum protections afforded by the Fourth Amendment of the United States Constitution.

We have carefully reviewed information known to JUH's officials when they requested the drug tests, to determine whether they had reasonable cause at the time under these standards. *See id.* at 1568.

Information they learned after the fact may not form the basis for reasonable cause. *See id.* At the relevant time, Ms. Blanks suspected that petitioners had some involvement with illegal drug use, because she observed a "yellow straw about three to four inches long . . . and it had a white residue in one end of it" in the chart room. She believed that the straw was used by petitioners, but she observed no erratic behavior by petitioners and she did not believe that either petitioner appeared to be under the influence of any substances. Searches revealed no substances on either petitioner, but did reveal a straw on Mr. Hudson, which Ms. Blanks indicated was not the straw she saw earlier in the chart room. Other information purportedly relied on by SPC, such as the suggestion that Ms. Best instigated the telephone call to draw Ms. Blanks out of the chart room, was not discovered until later.

The superior court noted the following in its Order:

Commission Findings 91, 92, 93 and 94, that Respondent had objective and articulable grounds for requesting that Petitioners submit to drug testing, are not supported by substantial evidence. The record shows that Mr. Brock did not consult with Dr. Christian prior to requesting that the Petitioners submit to drug testing. (T.Vol.IIB,pp. 227, 237, 240.) The reasons for Dr. Christian requesting the drug tests put forth by the Respondent and adopted by the Commission were not matters known to Dr. Christian prior to Mr. Brock's request that the Petitioners submit to testing, but were reasons developed by the Respondent after the fact in order to justify the drug testing request. (T.Vol.IIA, pp. 159-66.) The record shows that the Respondent's request for drug testing relied on speculation that the straw contained contraband and that the Petitioners were responsible for the straw. Based on this Court's review of the whole record, the Commission's Findings 91, 92, 93 and 94 were not supported by substantial evidence.

We agree.

In sum, the whole record reveals that at the critical time, officials at JUH knew that Ms. Blanks was suspicious of a straw with a powder residue that she saw in the chart room, which she connected to petitioners, and which she believed could indicate some illegal drug activity. Ms. Blanks could not identify the powder residue, and was not able to articulate any other basis for her suspicion. No other JUH employee had similar suspicions and the strip searches of petitioners

revealed nothing improper or illegal. Thus, we agree with the superior court that management at JUH had no "reasonable cause" to believe that either petitioner "[was] using or [was] under the influence of alcohol or a controlled substance." Directive 47.

[3] As the officials at JUH had no reasonable cause to request drug tests of petitioners, the Department had no basis to terminate their employment for refusing to comply. *See Gardner v. Broderick*, 392 U.S. 273, 277, 20 L. Ed. 2d 1082, 1086 (1968); *Fleckenstein v. Dep't of the Army*, 63 M.S.P.R. 470, 473-74 n.3 (1994). A person may not be discharged "for refusing to waive a right which the Constitution guarantees to him." *Gardner*, 392 U.S. at 277, 20 L. Ed. 2d at 1086. In *Gardner*, petitioner, a New York City police officer, was fired for refusing to waive his privilege against self-incrimination. *See id.* at 278, 20 L. Ed. 2d at 1087. The United States Supreme Court held that discharging him "solely for his refusal to waive the immunity to which he is entitled" under the Constitution was improper. *Id.* Here, petitioners elected not to waive their Fourth Amendment rights and refused to take the drug test. Because there was no reasonable cause to request the test, petitioners were improperly fired for refusing to submit to the test.

[4] Next, we address the Department's assertion that the SPC's Decision and Order was supported by substantial evidence in the record, and that the superior court's factual findings were not. Because this case turns on the issue of reasonable cause, we address only those findings of fact concerning whether JUH had reasonable cause prior to its request that petitioners submit to drug tests. We apply the "whole record" test to examine whether the SPC's findings of fact were supported by the evidence. *See Amanini*, 114 N.C. App. at 675, 443 S.E.2d at 118.

A number of the SPC's findings address the evidence that it believed supported reasonable cause, including Findings of Fact numbers 9, 12, 13, 19, 20, 21, 32, 43, 69, 73, 74, 84, 85, 86, 91, 92, 93, and 94. After reviewing the whole record, we note that Ms. Blanks was the only witness presented who made pertinent observations that formed the stated basis of reasonable cause prior to JUH's request that petitioners submit to a drug test. Ms. Blanks testified that she saw petitioners in the chart room, but they left soon after she arrived. She saw a straw with powdery residue which disappeared when Mr. Hudson retrieved his keys and cigarettes. She clearly stated that the straw seized from Mr. Hudson was not the same straw.

These observations constituted the entire basis for Ms. Blanks' suspicion that petitioners were engaged in illegal drug activity. Ms. Blanks testified that Mr. Hudson appeared "laid back" during the meeting in Ms. Schuchardt's office, however, no other employees corroborated this observation or articulated any basis for suspicion of drug use by petitioners during the morning of 15 February 1997. In fact, Ms. Schuchardt, Mr. Hudson's supervisor, testified:

Q. Okay. At any point during the time that he was working for you, did you ever believe him to be impaired by drugs or alcohol while on duty?

A. No.

. . .

Q. Okay. And did [Ms. Blanks] tell you about seeing a straw in the room?

A. Yes.

Q. And at that point you didn't have any reason to believe that Mr. Hudson was impaired that day.

A. No.

Ms. Blanks testified during cross-examination as follows:

Q. So they [petitioners] were behaving normally in the [chart]room?

A. Yes, sir.

. . .

Q. Okay. Would there have been anything that you saw them doing that you thought that they should have been pulled off the ward? Were they dangerous?

A. No, sir.

Q. Were they doing anything that would have imperiled a patient?

A. Not that I observed.

Q. Okay. Did you actually see either of them using drugs?

A. No, sir.

Q. Were they involved in any sort of accident or occurrence during this time?

A. No, sir. Not of my awareness.

Q. Okay. Now, you didn't see anything that showed that they were involved in drugs. Did you see the straw in their hand?

A. No, sir.

Q. Did you see the straw in their possession?

A. No, sir.

Q. Did Mr. Hudson or Ms. Best come to you and say we've got some drugs, would you like to buy some?

A. No, sir.

Q. Okay. Did they say we've got some drugs, would you like to use them with us?

A. No, sir.

Q. Did you see them give anyone else any drugs or drug paraphernalia?

A. No, sir.

Q. Did you see them do it while they were operating a vehicle or equipment?

A. I didn't even observe that. Operating a vehicle or equipment.

Counsel for petitioners also questioned Ms. Blanks concerning her knowledge of drug paraphernalia and her ability to accurately identify it. When asked whether knowledge of drug paraphernalia was part of her job, Ms. Blanks responded:

A. I have training related to the drugs in the workplace policy, and as a supervisor of a staff who have CDL's that we've had some special training on. Substance abuse issues, plus patient programming. I watch t.v. and things that give me some general knowledge [] about dru[g] paraphernalia.

Q. And it was based on your feeling, though, that you determined that this was contraband?

A. Yes, ma'am.

She also testified:

Q. What sort of training have you had in the medical field?

A. Medical field?

Q. Yes.

A. None.

Q. You have no training in pharmacy or pharmacal—you have no training in drugs?

A. No, sir. I mean, in terms of the training and in terms of the policies and those—are you talking—

Q. If you have any familiarity at all with drugs?

A. I guess no is the answer. I don't know.

Q. If I were to put down on the table a thing of cocaine, a thing of saccharin[], a thing of sugar, a thing of condensed milk—powder dry milk. Would you be able to tell us without absolute doubt which is which?

. . .

A. No, I guess not.

This testimony reveals the absence of any "specific objective and articulable facts and reasonable inferences drawn" to show reasonable cause under Directive 47 or the Fourth Amendment of the United States Constitution. We hold that petitioners carried their burden of proving that JUH did not have reasonable cause to request that they submit to drug testing. Without such "reasonable cause," the Department lacked just cause for terminating petitioners. We affirm the superior court's Order.

AFFIRMED.

Judge TIMMONS-GOODSON concurs.

Judge TYSON dissents.

TYSON, Judge, dissenting.

Yolandra Best and Roy Hudson (collectively "petitioners") failed to show that the Department of Health and Human Services, John Umstead Hospital ("JUH") did not have "reasonable cause" to suspect that petitioners were using or possessing drugs. Dr. Patricia Christian ("Dr. Christian"), director of JUH, had "reasonable cause" to request

that petitioners submit to a drug test. Petitioners' refusal to undergo drug testing was insubordination that justified their termination. I would reverse the superior court and affirm the State Personnel Commission's ("SPC") decision. I respectfully dissent.

I agree with the majority's statement of the appropriate standard of review, and that petitioners have the burden of proof to show that respondent lacked just cause to terminate petitioners' employment. I also agree with the majority's conclusion that "reasonable cause is a less demanding standard than probable cause . . . ."

I do not agree with the majority's conclusion that "application of 'reasonable cause' . . . did not comply with . . . the minimum protections afforded by the Fourth Amendment of the United States Constitution." The majority opinion does not conclude that the "reasonable cause" standard in the Alcohol and Drug Free Workplace Policy ("Directive 47") violates the United States and/or the North Carolina Constitutions. The majority opinion holds that "JUH did not have reasonable cause to request that [petitioners] submit to drug testing."

Directive 47 provides that "reasonable cause" must exist before any State employee is required to submit to a drug test.

> When management has <u>reasonable cause</u> to believe an employee is using or is under the influence of alcohol or a controlled substance in violation of this policy, the employee may be required to submit to a drug . . . test.

Directive 47 defines "reasonable cause:"

> Reasonable Cause Drug Testing means testing <u>based on a belief</u> that an employee is using or has used alcohol or drugs in violation of the department's policy <u>drawn from specific objective and articulable facts and reasonable inferences drawn from those facts in light of experience</u>. Among other things, such facts and inferences may be based on, <u>but not limited to</u>, one of the following:
>
> . . . .
>
> D. Evidence that an employee is involved in the use, possession, sale solicitation, or transfer of drugs or alcohol while working or while on the employer's premises or operating the employer's vehicle, machinery, or equipment.

(Emphasis supplied).

## I. The Dispositive Issue

The dispositive issue is whether Dr. Christian, who had the ulti-mate decision pursuant to Directive 47 to require drug testing, had "reasonable cause to believe" that petitioners were using or possess-ing illegal drugs at the time she ordered the tests. This issue is under analyzed by the majority.

The majority opinion states that "[n]either Ms. Blanks, Ms. Schuchardt, Mr. Brock, nor Officer Pendleton saw evidence of abnor-mal or erratic behavior, nor did any of them see any indication that either petitioner was impaired." This statement is the right observa-tion about the wrong inquiry. Whether the evidence proves that peti-tioners were under the influence of illegal drugs is not the issue. Evidence of being under the influence is a factor that can lead to rea-sonable cause. It is not the only factor. Directive 47-D states that evi-dence of the *use or possession* of illegal drugs is sufficient.

The majority opinion does not address: (1) what facts Dr. Christian knew, (2) when she knew them, (3) what inferences she drew from those facts, (4) whether those inferences were reasonable, and (5) whether those facts and inferences objectively provide rea-sonable cause. The answers to those questions are dispositive of whether reasonable cause existed to order drug testing of petitioners.

## II. Application of "Reasonable Cause"

Substantial evidence shows that Dr. Christian had reasonable cause to believe that petitioners were involved in the use or posses-sion of drugs while working. Her belief was "drawn from specific objective and articulable facts and reasonable inferences drawn from those facts in light of experience," and those facts and inferences sup-port an objective determination of reasonable cause. This case is based on direct and circumstantial evidence and the inferences drawn from that evidence.

The majority opinion presumes that Mr. Brock arrived at the hos-pital having already decided, whether on his own or pursuant to Dr. Christian's directive, to test petitioners. The record does not support this presumption.

The majority's conclusion that "[a]fter reviewing the whole record, we note that Ms. Blanks was the only witness presented who made pertinent observations that formed the stated basis of reason-able cause prior to JUH's request that the petitioners submit to a drug

test" is also not supported by the evidence and grossly misstates the facts in the record. I address the evidence in the record.

## A. Dr. Christian's Affidavit and Testimony

Dr. Christian filed an affidavit and later testified before the administrative law judge. Her testimony shows: (1) what she knew, (2) when she knew it, and (3) the inferences she drew prior to making the decision to drug test petitioners. Dr. Christian testified that she first became aware of the incident when Josephine Schuchardt ("Ms. Schuchardt"), petitioners' immediate supervisor, called her at home and reported that "she had come across a problem that she had never had before and she didn't know how to handle it and she didn't want to blow it." Dr. Christian testified that Ms. Schuchardt recounted to her Amanda Blanks' ("Ms. Blanks") entire recollection of the events. Dr. Christian also testified that Ms. Schuchardt stated in that first telephone call that Ms. Blanks had received a "bogus— that was her [Ms. Schuchardt's] word—bogus phone call that took her [Ms. Blanks] out of the [chart] room and during that time, the male health care tech [Mr. Hudson] went back into the record room."

Dr. Christian testified that she directed Ms. Schuchardt to call the Butner Public Safety Department pursuant to Directive 47. Ms. Schuchardt complied. Dr. Christian then called Edgar Sanford Brock III ("Mr. Brock"), the personnel director, and informed him of Ms. Schuchardt's report. Dr. Christian testified that she called Mr. Brock because, according to Directive 47, "the Personal director has to be involved." Dr. Christian then called Ms. Schuchardt, told her that she had spoken with Mr. Brock at home, and that he would remain there to assist her with the investigation, if Ms. Schuchardt needed him. Ms. Schuchardt corroborated Dr. Christian's call. Ms. Schuchardt testified that she called Mr. Brock at home. Mr. Brock was en route to JUH. Mr. Brock's wife gave Ms. Schuchardt his mobile number, and she called him in his car.

Dr. Christian testified that Mr. Brock called her when he arrived at the hospital and "[h]e told me that he was there on the ward with Ms. Schuchardt and that the officer was searching Mr. Hudson outside and that he would call back and inform me when he had more information."

Dr. Christian did not know petitioners personally, but knew of their positions in the Hospital. Dr. Christian testified that she considered Ms. Blanks an "honest" person "based on serving on committees

with her and on projects that she's worked on." She also testified that she knew that "Mr. Brock felt that she ["Ms. Blanks] had a reputation for honesty" and that "he thought she was a very credible witness." Dr. Christian testified that she also considered information about the demeanor of petitioners as related to her by Mr. Brock and Ms. Schuchardt.

Dr. Christian testified that Mr. Brock had "told me that [Officer Pendelton] had found a straw in Mr. Hudson's pocket," and that she used that information in determining "whether or not there was reasonable cause." Dr. Christian:

> inferred from this evidence that Hudson was tied very closely to the tainted straw that had disappeared. That is, in my life experience, I don't know anyone who carries or saves plastic straw remnants. In fact, I don't know of any use at JUH for short straw segments.

Dr. Christian concluded that "[t]he coincidence of [Mr. Hudson] being the last person with access to a powder-tainted straw segment (before it disappeared) and then being found in possession of what appeared to be the remnant segment, was too great to accept as mere coincidence."

Dr. Christian stated in her affidavit that she and Ms. Schuchardt had reviewed the facts and "concluded that there were many suspicious circumstances that when taken as a whole lead to the inescapable conclusion that there was reasonable cause to believe that Hudson and Best had used drugs on the job." Dr. Christian also testified that Mr. Brock "and I together agreed that [drug tests were] warranted, and I told him to go ahead and proceed with requesting . . . tests."

Ms. Schuchardt testified that she was present when "Mr. Brock requested Ms. Best and Mr. Hudson" to submit to a drug test. Dr. Christian stated that Mr. Brock told her that "Hudson would not talk about the straw, either to deny or verify that he'd seen one in the record room" and that Ms. Best was "avoiding eye contact" when she was asked about the events of that morning. Dr. Christian stated that "[i]n my life experience, a health care worker will deny, vigorously, when falsely accused of something as serious as drug use on the job."

Dr. Christian testified that the facts she received were related to her by Mr. Brock and Ms. Schuchardt, and that she had not made a decision to test petitioners until Mr. Brock finished his investigation.

Dr. Christian stated that she conferred with Mr. Brock "to make sure that [she] was not making unreasonable inferences and judgments." This testimony is consistent with and corroborated by all other individuals involved in the investigation into petitioners' conduct.

## B. Ms. Blanks' Affidavit and Testimony

Ms. Blanks testified by affidavit and before the administrative law judge. Ms. Blanks stated that she went to work on Saturday, 15 February 1997, at approximately 9:30 a.m. to review and audit charts inside the chart room. This date was a non-scheduled work day for her, and no one expected her to be at work. Ms. Blanks approached the nurses' station, where the chart room entry door is located. She observed Mr. Hudson exit the chart room. She continued to walk through the nurses' station toward the chart room entry door where she saw Ms. Best exit the chart room.

Ms. Blanks entered the chart room, sat down to audit files, and observed a yellowish straw that had been cut to approximately three inches in length, car keys, and a pack of cigarettes located on a counter-top. Ms. Blanks observed a white powdery substance in one end of the straw. Ms. Blanks was the only person present in the chart room at that time. Ms. Blanks testified that she sat in the chart room for a moment and pondered what to do.

Ms. Blanks testified that she was unexpectedly summoned from the chart room to answer a telephone call in the nurses' station. She exited the chart room and answered the telephone a few feet away from the chart room door. She testified that she "maintained a constant view of the chart room" entry door at all times. Ms. Blanks also testified that she was not "quite sure" who the person on the other line was, but speculated the voice sounded like Yvonne Sneed's. Ms. Blanks did not know the answer to the question she was asked. Ms. Blanks stated that she was "suspicious [of the phone call] because I was not scheduled to work that day and was not working my usual ward. Sneed had not seen me at work and could not have expected me to be near the nurses station on Ward 353." As Ms. Blanks was hanging up the telephone, she observed Mr. Hudson re-enter the chart room announcing "where are my keys." He quickly exited the chart room with his keys and a pack of cigarettes and stated that he was "going for a smoke."

Ms. Blanks immediately re-entered the chart room and noticed that the cut straw, car keys, and cigarettes were missing from the

counter-top. No other person had entered or left the chart room between the time that Mr. Hudson re-entered the chart room, exited the chart room, and Ms. Blanks re-entered the chart room.

Ms. Blanks testified that after "five to ten minutes" of contemplation, she left the chart room to look for Ms. Schuchardt. Ms. Blanks located Ms. Schuchardt at approximately 10:00 a.m., and reported the events that she had witnessed, including the "suspicious" phone call that caused her to leave the chart room. They talked for approximately twenty to thirty minutes. Ms. Blanks testified that Ms. Schuchardt stated to her that the incident "[s]ounds like something I need to look into."

### C. Ms. Schuchardt's Testimony

Ms. Schuchardt testified as a witness for petitioners. She stated that Ms. Blanks reported to her what she had witnessed and that they discussed the matter at length. Ms. Schuchardt testified that "I reported [to Dr. Christian] what [Ms. Blanks] had said and what she had observed and the series of behaviors that took place in the whole picture, not just the powder—[in] the nurses' station, but all of the events." (Emphasis supplied). "At the time of the phone call, it was my understanding that . . . [Mr. Hudson] was the only one that had been in [the chart room]."

Ms. Schuchardt testified that she told Dr. Christian that "I probably did give the opinion that [the telephone call] was suspicious based on the information that I had received" from Ms. Blanks. Ms. Schuchardt testified that she believed the telephone call which caused Ms. Blanks to leave the chart room "was questionable."

Ms. Schuchardt also stated that Mr. Hudson had walked into her office unannounced, prior to his knowledge that an investigation was underway, and asked:

if I had seen [Ms. Blanks] and I said yes. And he said, 'Well?' And I said, 'Well, what?' And he said, 'Well, did [Ms. Blanks] report to you that I was smoking in the office or on the ward?' And I said, 'No, she didn't report to me that you were smoking in the office.'

Dr. Christian swore in her affidavit that she used this incident, along with others, to determine whether there was reasonable cause to require the drug tests. Petitioners attempt to attack Dr. Christian's credibility, but they never explain this testimony. This incident is

uncontradicted and is not considered or even mentioned in the majority opinion.

### D. Mr. Brock's Affidavit and Testimony

Mr. Brock testified by affidavit and later at the hearing that he received a phone call from Dr. Christian about a "potential situation of possible drug use at the hospital." Mr. Brock decided that "the best thing for me to do was to go to the hospital to provide . . . assistance . . . . I left on my own. [Dr. Christian] did not instruct me to leave at that point." "This would allow me to consult with Ms. Schuchardt and report my findings to Dr. Christian." Mr. Brock testified that he drove to JUH at approximately 12:00 p.m. Upon arrival, he walked to his office and retrieved two drug test kits "in case we might use them." He testified that he "did not know whether we were going to [use them] or not, but there was a potential we could." Mr. Brock testified that he called Dr. Christian to inform her that he was at the hospital. He met Lieutenant Pendelton, who had been dispatched to the hospital after Ms. Schuchardt had called the Butner Public Safety Department at Dr. Christian's direction.

Mr. Brock stated in his affidavit that Lieutenant Pendelton conducted a search of Mr. Hudson, and requested that Ms. Schuchardt and Ms. Blanks search Ms. Best for illegal drugs. Ms. Schuchardt testified that she "never touched Ms. Best. Ms. Best removed her own clothes." Mr. Brock testified that Lieutenant Pendelton told him that "he found a yellow straw," after he completed his search. Mr. Brock testified that Lieutenant Pendelton told him the results of his search before Mr. Brock again called Dr. Christian to review the information he knew at that point.

Mr. Brock testified that "[a]fter [petitioners] denied any knowledge of the straw, before I moved on, I went and made a telephone call to Dr. Christian." During a final conversation with Dr. Christian before the drug tests were ordered, Mr. Brock testified that:

> [s]he asked my opinion, whether we felt reasonable cause was met. I said that is my opinion. I feel with the effects we have, it has been met. We both concurred that we would go ahead with testing, and she gave me instructions to move forward with the procedures for a drug test on these two individuals.

Dr. Christian testified that about "an hour" after Mr. Brock had first called her from the hospital, he called her again. Dr. Christian testi-

fied that "[Mr. Brock] and I talked at—I say at length. . . . . I asked him if he thought we had enough to go with probable testing. He said yes, and I certainly agreed with that."

### E.  Lieutenant Pendelton's Testimony

Lieutenant Pendelton testified that he is employed by the State of North Carolina's Department of Crimes Control, Public Safety. He is not an employee of JUH. He testified that when he arrived at JUH, he "made contact with Ms. Blanks and Jo Schuchardt in Ward 393." Lieutenant Pendelton prepared an Incident/Investigation Report on 15 February 1997, the day of the incident, wherein he stated that "[t]he activities of the [petitioners] aroused Mrs. Blanks suspicion." After discussing the events that transpired, Officer. Pendelton testified that "Ms. Schuchardt informed me that she thought [petitioners] had gone to lunch . . . . When I exited the building . . . [petitioners] were coming up the street." Lieutenant Pendelton searched Mr. Hudson by consent, and "[w]hen he emptied his pockets, he emptied his right pocket and laid the contents on the hood of the truck. The yellow straw was in his right pocket—his right front pocket." Officer Pendelton testified that he "picked [the yellow straw] up. [He] looked at it, observed a white powdery substance inside the straw, and [he] seized it." Lieutenant Pendelton testified that he showed the straw to Ms. Blanks and that she said the yellow straw "looked like [the one she saw]." Lieutenant Pendelton testified that Mr. Hudson made no efforts to explain the straw.

### III.  The "Suspicious" Telephone Call

I agree with the majority that "[i]nformation they [respondent] learned after the fact [of the demand for drug tests] may not form the basis for reasonable cause." I do not agree that "information purportedly relied on by the SPC, such as the suggestion that Ms. Best instigated the telephone call to draw Ms. Blanks out of the chart room, was not discovered until later" negates the fact that Dr. Christian and her staff knew the phone call was "bogus" or "suspicious." After the drug tests were ordered and refused, respondent discovered that Ms. Best had, in fact, instigated the call that caused Ms. Blanks to leave the chart room and allowed Mr. Hudson, at that time, to retrieve the cut straw. This later known fact is immaterial.

There is substantial overwhelming evidence that Dr. Christian was aware that the telephone call was "suspicious" or "bogus" from the first time she learned of the incident. Petitioners' own witness,

Ms. Schuchardt, testified that the call "was questionable," and that she told Dr. Christian that the call was "suspicious." The later discovery that the call was, in fact, instigated by Ms. Best only confirms and justifies, but does not negate, the staffs' suspicions prior to the demand for drug tests. This later discovered fact was unknown, was not considered in the initial inquiry, and was not a factor in ordering the tests.

### IV. Findings 91, 92, 93, and 94

The majority opinion quotes the superior court's conclusions at length and summarily "agrees" that the SPC's findings of fact 91 through 94 "are not supported by competent evidence." The majority's agreement is not supported by the record.

First, the quoted portion of the superior court's conclusion states that the "record shows that Mr. Brock did not consult with Dr. Christian prior to requesting that the Petitioners submit to drug testing." In support of this assertion, the superior court cites transcript testimony where Mr. Hudson is answering "no" to his attorney's question "at any point during that meeting did Mr. Brock get up and leave." The superior court also used Mr. Hudson's "no" response to the question of whether Mr. Brook ever told him that he talked to Dr. Christian. This testimony is the superior court's entire justification for its conclusion. This conclusion is not supported by the evidence in the record. Substantial and consistent evidence compels a contrary result.

Second, the superior court states that "[t]he reasons for Dr. Christian requesting the drug tests put forth by the Respondent and adopted by the Commission were not matters known to Dr. Christian prior to Mr. Brock's request that the Petitioners submit to testing, but were reasons developed by the Respondent after the fact in order to justify the drug testing request." This conclusion is unfounded.

The superior court cites testimony by Dr. Christian on cross-examination to support its conclusion. Petitioners questioned how Dr. Christian could state in her affidavit her sensorial perceptions about petitioners' behavior at a meeting at which she was not present. Dr. Christian testified that those perceptions were conveyed to her by Mr. Brock, who had witnessed petitioners' demeanor. As the director of JUH, Dr. Christian was certainly entitled to rely on reliable information obtained and furnished to her by her personnel director and

the petitioners' supervisor, both of whom Dr. Christian had known and trusted for many years.

Petitioners attempt to impeach Dr. Christian about matters that occurred solely at the final meeting between Mr. Hudson, Ms. Best, Mr. Brock, Ms. Schuchardt, and Ms. Blanks. The superior court and the majority opinion fail to address all of the other facts and inferences that Dr. Christian knew when she made her decision to request that petitioners submit to drug tests. Dr. Christian knew objective and articulable facts when she ordered drug tests and those facts justify her determination of reasonable cause, even if Mr. Brock's statements about petitioners' demeanor at that meeting are omitted. Dr. Christian had reasonable cause to order the tests immediately after Officer Pendelton searched Mr. Hudson.

Third, the superior court states that "Respondent's request for drug testing relied on speculation that the straw contained contraband and that the Petitioners were responsible for the straw." Dr. Christian knew that Ms. Blanks had observed a yellowish cut straw with a white powdery substance next to Mr. Hudson's keys and cigarettes. Ms. Blanks was called out, Mr. Hudson walked in, removed his keys and cigarettes, and the cut straw disappeared. Mr. Hudson testified that the keys and cigarettes he retrieved from the chartroom belonged to him. Lieutenant Pendelton discovered a yellow cut straw in Mr. Hudson's pocket that could have been either: (1) the straw section Ms. Blanks saw, (2) the remaining portion of the cut straw, or (3) a cut portion of a straw unrelated to the one that Ms. Blanks saw. Based on these objective and articulable facts, it was not an unreasonable inference, drawn by Dr. Christian, that the cut straw was "drug paraphernalia." The discovery of a cut straw on Mr. Hudson's person corroborated Ms. Blanks earlier visual observation. These facts, and the inferences drawn from them, along with all of the other circumstantial evidence known by Dr. Christian, would compel a reasonable person to conclude that Mr. Hudson and Ms. Best used or possessed illegal drugs at work.

The majority opinion discusses at length Ms. Blanks "knowledge of drug paraphernalia." Ms. Blanks subjective understanding of drug paraphernalia or drugs is entirely irrelevant. Ms. Blanks' suspicions or hunches are also immaterial. The controlling questions are what facts did Dr. Christian know, when did she learn them, and whether a reasonable person with knowledge of those facts could reasonably believe that petitioners were using or possessing drugs.

## V. Reasonable Cause

Reasonable cause, like probable cause, is an objective, not a subjective, standard. " '[T]he scope of the Fourth Amendment is not determined by the subjective conclusion of the law enforcement officer.' " *State v. Peck*, 305 N.C. 734, 741, 291 S.E.2d 637, 641 (1982) (quoting *United States v. Clark*, 559 F.2d 420 (5th Cir. 1977), *cert. denied*, 434 U.S. 969, 54 L. Ed. 2d 457 (1977), quoting *United States v. Resnick*, 455 F.2d 1127 (5th Cir. 1972)).

> The officer's subjective opinion is not material. Nor are the courts bound by an officer's mistaken legal conclusion as to the existence or non-existence of probable cause or *reasonable* grounds for his actions. The search or seizure is valid when the objective facts known to the officer meet the standard required.

*Peck*, 305 N.C. at 741-42, 291 S.E.2d at 641-42 (citing *Scott v. United States*, 436 U.S. 128, 56 L. Ed. 2d 168, *reh'g denied*, 438 U.S. 908, 57 L. Ed. 2d 1150 (1978) (other citations omitted) (emphasis in original)).

Reasonable suspicion depends upon the content of information and the degree of its reliability. *Alabama v. White*, 496 U.S. 325, 110 L. Ed. 2d 301 (1990). "Direct observation or physical evidence of on-duty impairment, while important, is not the only information which will support such testing. Rather, information which would lead a reasonable person to suspect . . . employees . . . of on-the-job drug use, possession or impairment is sufficient under the Fourth Amendment." *Benavidez v. City of Albuquerque*, 101 F.3d 620, 624 (10th Cir. 1996) (citing *National Treasury Employees Union v. Yeutter*, 918 F.2d 968, 974 (D.C. Cir. 1990) ("Constitution requires reasonable suspicion of on-duty *drug use* or drug-impaired work performance") (emphasis in original); *Jackson v. Gates*, 975 F.2d 648, 653 (9th Cir.1992), *cert. denied*, 509 U.S. 905, 125 L. Ed. 2d 690 (1993); *Ford v. Dowd*, 931 F.2d 1286, 1292-93 (1991)). Directive 47 does not require evidence of impairment to sustain reasonable cause to order drug tests.

> The determination of reasonable suspicion, like that of probable cause, necessarily *turns upon the information the person making the determination had when that person acted. The facts then before that person either were or were not sufficient to create a reasonable suspicion that a particular individual used drugs.*

*Garrison v. Department of Justice,* 72 F.3d 1566, 1569 (Fed. Cir. 1996) (emphasis supplied). "What is reasonable, however, depends upon all the facts and circumstances of the particular situation." *Id.*

> 'Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause.'

*Id.* (quoting *White,* 496 U.S. at 330, 110 L. Ed. 2d at 309 (1990)). "That level of suspicion is considerably less than proof of wrongdoing by a preponderance of the evidence." *White,* 496 U.S. at 330, 110 L. Ed. 2d at 308.

### VI. Summary

Dr. Christian did not know petitioners personally, but knew their positions in the hospital. The facts that Dr. Christian knew prior to ordering the drug tests were that: (1) Ms. Blanks had a reputation for honesty; (2) Ms. Blanks had come to work unannounced; (3) Ms. Blanks witnessed petitioners exit the chart room moments before she entered the room; (4) no other person entered or exited the room during the relevant and interim period; (5) Ms. Blanks saw a cut straw that contained white powder; (6) Ms. Blanks was suspiciously called out of the chart room immediately before Mr. Hudson quickly re-entered; (7) Ms. Schuchardt thought the phone call was suspicious; (8) no person other than Mr. Hudson and Ms. Best and the person who called Ms. Blanks to the telephone was aware that Ms. Blanks was in that chart room; (8) Mr. Hudson mysteriously appeared in Ms. Schuchardt's office and asked if Ms. Blanks had reported him for smoking; (9) Lieutenant Pendelton, an independent police officer, not a JUH employee, searched Mr. Hudson and found a yellow cut straw in his pocket, which *he believed contained white powder.* This discovery corroborated Ms. Blanks' prior observations of the cut yellowish straw containing white powder; (10) Ms. Blanks testified that the straw Officer Pendelton found on Mr. Hudson looked like the one she saw in the chart room; (11) a cut straw three or four inches long is used to ingest white powdery drugs; (12) Mr. Hudson was linked very closely to the cut yellow straw that disappeared; and (13) no legitimate use for a short, cut straw segment existed at JUH.

Ms. Schuchardt and Mr. Brock observed petitioners' demeanor and described that demeanor to Dr. Christian. Dr. Christian knew that Ms. Best and Mr. Hudson would not talk about the straw, either to deny or verify that they had seen one in the chart room. She knew that Ms. Best avoided eye contact after she was confronted with the facts. Dr. Christian knew from life experience that health care workers will vigorously deny false accusations regarding drug use on the job. Mr. Hudson offered no information or explanation to Lieutenant Pendelton about the cut straw discovered in his pocket. Dr. Christian knew that Ms. Schuchardt would speak openly about her opinions, and knew that Ms. Schuchardt did not protest petitioner's innocence nor question whether "reasonable cause" existed. Dr. Christian reviewed all of the facts and circumstances with Mr. Brock and Ms. Schuchardt. All of this evidence led her to reasonably believe and objectively conclude that petitioners used or possessed drugs in the chart room prior to her decision to order drug tests.

## VII. Conclusion

This is not a criminal case. We are not determining whether there is sufficient evidence to uphold a jury verdict convicting petitioners of drug use, only whether reasonable cause existed to require petitioners to submit to a drug test. Reasonable cause is a less demanding standard than probable cause.

Dr. Christian properly initiated an investigation which provided to her specific, objective, and articulable facts conducted over a four hour period. She drew inferences from those facts in light of her experience to conclude that reasonable cause existed to believe that petitioners used or possessed illegal drugs in the chart room.

Dr. Christian serves as director of a large hospital. She knew that Mr. Hudson's and Ms. Best's positions provide hands-on care for numerous sick and fragile patients. Illegal drug use jeopardizes the entire hospital, including the many employees who comprise an intricate web of patient support for the entire hospital community. Dr. Christian is ultimately responsible for the direction and operation of JUH. North Carolina has a compelling interest in a hospital environment free from illegal drugs. Dr. Christian has a duty to protect her patients and employees from the effects of illegal drugs.

In light of her duty, the State's interest, and all of the facts and inferences drawn from those facts known to Dr. Christian at the time

she ordered the drug tests, it would have been unreasonable for Dr. Christian not to have directed petitioners to submit to drug tests. Petitioners' refusal to submit to properly required drug tests was insubordination that justified the termination of their State employment. I would reverse the superior court and affirm the order of the State Personnel Commission. I respectfully dissent.